Sharp v. VanWinkle.

## JAMES SHARP v. JOHN S. VANWINKLE.

GRANTS. *Articles of Convention between Tennessee and Kentucky. Statute of limitations. Adverse possession.* The vacant and unappropriated lands on the northern border of this State, which, by the fifth article of the convention of February 2, 1820, between Tennessee and Kentucky, it was provided, "shall be the property of, and subject to the disposition of the State of Kentucky," are "granted by this State," within the meaning of the statute of limitations of 1819, brought into the Code, sec. 2763 *et seq.*, and title thereto may be acquired by an adverse possession, under a grant from this State, for the time prescribed by the statute.

### FROM SCOTT.

Appeal in error from the Circuit Court of Scott county. D. K. YOUNG, J.

HENDERSON & JOUROLMON for Sharp.

W. S. VanWinkle and L. A. Gratz for Van-Winkle.

Cooper, J., delivered the opinion of the court.

Action of ejectment by VanWinkle against Sharp, tried upon agreed statement of facts. The circuit judge rendered judgment in favor of VanWinkle, and Sharp appealed.

The land in controversy lies in the counties of Scott and Campbell, north of latitude 36° 30″. VanWinkle claims title by regular assignment from the grantees, under a grant properly obtained and duly issued by the State of Kentucky. The grant, or patent as it is called in Kentucky, dated April 7, 1851, is for 16,000 acres, upon a survey made March 5, 1851, and describes the land by metes and bounds. It calls, in substance, omitting details, for a beginning corner in the boundary line between the States of Kentucky and Tennessee, thence with that line due west 4436 poles, thence south 20° west 1900 poles to a stake in the line of latitude 36° 30″, thence with that line as run and marked 4736 poles, thence north 20° east 1900 poles to the beginning, "platting out all the lands in said boundary heretofore surveyed, estimated at 35,200 acres, and 1275 acres of land entered in said boundary to be hereafter surveyed, a list of which and the names of the applicants is appended to the record of the survey." It is agreed by the parties that the grantees proceeded according to Kentucky statutes in force in all respects in appropriating the land granted, paying a valuable money consideration

therefor. It is further agreed that, at the date of making the survey of the 16,000 acres and issuance of the grant, there had been appropriated by other persons at least 35,200 acres of land, by legal surveys, lying inside of the external boundaries described in said survey and grant, and that said surveys were duly recorded in the proper office in Whitley county, Kentucky, and that the entries mentioned in and platted out of said grant of 1275 acres, were legally made and recorded in the same office, and that all of the various tracts so surveyed or entered could be, and were then capable of identification and location by matter of record. It was also agreed that the legal title to the land thus granted had been vested by mesne conveyances for a valuable consideration in the plaintiff, VanWinkle, but that no actual possession of the land had ever been taken under the grant. The land had been regularly assessed for taxes in Scott and Campbell counties since the issuance of the grant.

The defendant, Sharp, claims title under a grant from the State of Tennessee, younger than the plaintiff's grant, and adverse possession. In 1870, Sharp made an entry in the entry-taker's office of Scott county of 5,000 acres of land, and obtained a grant therefor in 1873. The entry and grant lap over on the lands covered by the plaintiff's grant, at the southwest corner, to the extent of 2,000 acres, of which, however, about 1,000 acres only were vacant and unappropriated when the grants of the litigants were obtained. The defendant, Sharp, through his tenants, had entered upon the land in the interlap not covered

by older claims than those of either of the parties, and enclosed three different parcels, amounting in all to 100 acres, claiming under his grant, and had held the same for more than seven years last past, and still so holds them. He made the settlements as owner of the whole of the vacant interlap, with the intention to hold it to the extent of the boundaries of his grant.

If the land lay anywhere else in the State than in the territory between the line of 36° 30″, and the boundary line between the States of Tennessee and Kentucky, east of the Tennessee river, the defendant, Sharp, would be held to have acquired the better title by virtue of his adverse possession, under the statute of limitations: Code, sec. 2763. The doubt is whether the statute of limitations applies to the territory in question, and, if it does not, whether the plaintiff's Kentucky grant is valid on its face.

The Code, sec. 2763, is: "Any person having had, by himself or those through whom he claims, seven years' adverse possession of any lands, tenements, or hereditaments granted by this State or the State of North Carolina, holding by conveyance, devise, grant, or other assurance of title purporting to convey an estate in fee, without any claim by action at law or in equity commenced within that time, and effectually prosecuted against him, is vested with a good and indefeasible title in fee to the land described in his assurance of title."

Section 2765 is: "No person, or any one claiming under him, shall have any action, either at law or

in equity, for any lands, tenements or hereditaments, but within seven years after the right of action has accrued."

The first of these sections was intended to perfect a defective title by adverse possession for seven years, under an assurance of title purporting to convey an estate in fee, whether it be in form a conveyance, devise, grant, or other instrument, although the assurance may be invalid and void either at law or in equity: *Thurston* v. *University*, 4 Lea, 513, 519. The second section was intended to protect the adverse possession for seven years to the extent of the actual enclosures, if held under no title at all, and to the extent of the boundaries set out in the instrument, if the holding has been under an assurance of title not purporting to convey an estate in fee, as under an entry or title bond; *Dunlap* v. *Gibbs*, 4 Yer., 94; *Brown* v. *Johnson*, 1 Hum., 261.

The statute does not run until there is a valid grant of land from the sovereignty having title and jurisdiction, for the obvious reason that until there is a grant the title is in the sovereignty or State, and the statute does not run against the sovereign: *Singleton* v. *Ake*, 3 Hum., 626; *Cocke* v. *Dodson*, 1 Tenn., 169; *Calloway* v. *Hopkins*, 11 Heis., 349; Code, sec. 2762, 2766. And inasmuch as the State of North Carolina had once owned the territory of the State of Tennessee, and exercised its sovereignty by granting the land, the Legislature intended, by the language of the act of 1819, brought into the Code, sec. 2763, to recognize the grants of that State while sovereign in

the same way as the grants of Tennessee itself. No other State was considered as ever having had similar sovereignty so that its disposition of the soil should, in like manner, affect the rights of this State or its grantee. But it does not follow that the statute was intended to be limited in its operation to lands held under a particular class of titles. There were lands along our northern border claimed under titles derived from the States of Virginia and Kentucky, owing to the doubt which long existed touching the correct boundary between those States and this State. These titles had been validated by statutes expressly passed for the purpose. It was, we may safely say, never contemplated that lands held under these titles should not come within the provisions of a general law expressly passed to quiet titles by an adverse possession for a limited period of time. And it is only by adhering to the letter of the statute, giving the words used a very restrictive meaning, that a different conclusion can be reached. The reason why the words "granted by this State or the State of North Carolina" were used was that the statute might not run against the State or its grantee. But the reason would not exist where the State had already parted with its interest in the land, granted it in fact, in any mode. The words "granted by this State" need not be limited to lands disposed of by the State by the formal means of a grant, a well known instrument of a particular character, but may well be considered as including every mode of disposition by which the State could part with its title.

The parallel of latitude of 36° 30″ north was made by royal charter the boundary between the States of Virginia and North Carolina. About the year 1780 these States appointed commissioners to ascertain and mark the line of this parallel. The commissioners agreed upon a beginning corner, and ran the line westward in concert for about forty miles, and then disagreed. The Virginia commissioners extended the line thus begun to the Tennessee river, the line being known as Walker's line. The North Carolina commissioners ran another line two miles further north, about half the distance to the Tennessee river, known as Henderson's line. Afterwards Virginia and Tennessee appointed commissioners, who agreed to run a due west line equi-distant from Walker and Henderson's lines. This agreement was confirmed by this State by the act of November 3, 1803, ch. 58. The third section of this act provided that all claims or titles derived from the government of Virginia to the lands that fell into this State by the establishment of the agreed line should remain as secure to the owners as if derived from the government of North Carolina or Tennessee. In 1819. the State of Kentucky caused a line to be run by Alexander and Munsell, as the boundary between Kentucky and Tennessee, by which. the parallel of latitude of 36° 30″ north was found to be south of Walker's line. The two States thereupon appointed commissioners to settle the boundary line between them, and the commissioners, on February 2, 1820, agreed upon a convention making Walker's line the boundary from the southeast corner of Kentucky to the Ten-

nessee river, and that river and Alexander and Munsell's line the boundary to the Mississippi: Meigs' Dig., sec. 1828. This convention was adopted by the Legislature of Kentucky by an act passed on February 11, 1820.

Article 5 of this convention reads as follows: "All lands now vacant, and unappropriated by any person or persons claiming to hold under the States of North Carolina or Tennessee, east of the Tennessee river and north of the parallel of latitude 36° 30″ north, shall be the property of, and subject to the disposition of, the State of Kentucky, which State may make all laws necessary and proper for disposing of and granting said lands or any part thereof; and may, by herself or officers, do any acts necessary and proper for carrying the foregoing provisions of this article into effect; and any grant or grants she may make therefor, or any part thereof, shall be received as evidence in all the courts of law or equity in the State of Tennessee, and be available to the party deriving title under the same; and the land referred to in this article shall not be subject to taxation by the State of Tennessee for five years, except so far as the same may in the meantime be appropriated by individuals."

Article 6 of the convention provided that claims to land east of the Tennessee river, between Walker's line and the latitude of 36° 30″ north, derived from the State of Virginia in consideration of military services, should not be prejudiced in any respect by the establishment of Walker's line, but such claims should

be considered as rightfully entered or granted; "and the claimants may enter upon said lands, or assert their rights in the courts of justice without prejudice by lapse of time or from any statute of limitations for any period prior to the settlement of the boundary between the two States."

Article 7 is: "All private rights and interests of lands between Walker's line, from the Cumberland river * * to the southeastern corner of Kentucky * * and the parallel of 36° 30'' north latitude, heretofore derived from Virginia, North Carolina, Kentucky or Tennessee shall be considered as rightfully emanating from either of those States; and the States of Kentucky and Tennessee reserve to themselves respectively the power of carrying into grant claims not yet perfected; and in case of conflicting claims, if any there be, the validity of each claim shall be tested by the laws of the State from which it emanated, and the contest shall be decided as if such State respectively had possessed the jurisdiction and soil, and full power and right to authorize its location, survey or grant according to her own rules and regulations."

The convention, it will be noticed, provided for three classes of lands: First, vacant and unappropriated land at the date of the convention; second, land held under claims derived from the State of Virginia in consideration of military services; third, land east of the Cumberland river derived from Virginia, North Carolina, Kentucky or Tennessee. This last class of claims were to be considered "as rightfully emanating from either of those States," the validity of each claim,

in case of conflict, "to be tested by the laws of the State from which it emanated," and the contest to be decided "as if each State respectively had the jurisdiction and the soil." The claims of the second class were to be considered as rightfully entered or granted without prejudice by lapse of time or the statute of limitations prior to the settlement of the boundary between the two States. The lands of the first class, embracing all lands then vacant and unappropriated by North Carolina or Tennessee, were to be "the property of, and subject to the disposition of the State of Kentucky" by all necessary and proper laws and acts. The land in controversy falls in this class.

It is obvious that the State of Tennessee, by this convention, parted with all its title to the lands mentioned which were claimed under the other States named, and if not in terms, in plain legal effect, granted to the State of Kentucky the vacant and unappropriated land specified, with an exemption from taxation for five years, if not sooner appropriated by individuals under titles derived from that State. Tennessee could not afterwards rightfully grant any of these lands, and no reason occurs why a general statute of limitations should not apply to them. A grant of land may be made by a State by statute, convention, or treaty reservation, as well as by warrant, entry, or grant proper: *Blair* v. *Pathkiller*, 2 Yer., 406: *McConnell* v. *Mousepaine*, 2 Yer., 438; *Gillespie* v. *Cunningham*, 2 Hum., 19. The Henderson grant of 200,000 acres in East Tennessee, and the grant to Gen. Greene of 25,000 acres in Middle Tennessee,

were made by North Carolina by statute: Meigs Dig., sec. 1815. Lands are granted by the State whenever the State makes a valid disposition or surrender of its interest therein.

It is argued, however, that this court decided in *Crockett* v. *Campbell*, 8 Yer., 225, that the act of 1819 only applied to lands held under a grant, as a muniment of title, from North Carolina or Tennessee In that case, the plaintiff in ejectment claimed under a Virginia grant, the land lying between Henderson's line and the boundary line between Virginia and Tennessee as settled by agreement. The grant was made by that convention, we have seen, as valid as if " derived from the government of North Carolina or Tennessee." The defendant claimed title, the report says, by adverse possession for more than seven years " by virtue of a deed and decree." The point was made in defense that the compact of 1803 confirmed the Virginia title, and " granted the land in fact." But the court was of opinion that in 1803 the State of Tennessee had no power to grant the vacant soil within her limits, the title being in the United States under the cession act of North Carolina. But the defendant was held to be protected in his possession by the act of 1797, which was not repealed by the act of 1819, although it has since been repealed by the Code, under its general repealing clause, section 41. It is true the eminent judge who delivers the opinion of the court does take the language of the act of 1819 literally, and say: " The act of 1819 does not apply to grants made by Indian treaties

in the form of reservations, or to school sections, or to grants by Virginia east of the Cumberland mountains, or to a large number of grants made by Virginia, and especially by Kentucky west of the Cumberland mountains and east of the Tennessee river, lying south of Walker's line, but north of 36° 30″ north latitude provided for by the fifth, sixth and seventh articles of the compact of February 2, 1820, between Kentucky and Tennessee." But the remark, so far as it was not authorized by the provisions of the statute itself or then existing law, was a mere *dictum*, the court having already decided that the State had no power to grant the particular land in 1803, and that the defendant was protected by the act of 1797. Upon a reconsideration of the question in this case where the facts directly raise it, we are of opinion that the lands provided for by the fifth section of the convention between Kentucky and Tennessee were "granted by this State" to the State of Kentucky, and fall within the purview of the statute of limitations of the Code.

The grant under which the defendant claims has been wrongfully issued, in violation of property rights of the the State of Kentucky. And so every grant issued for land previously granted, is wrongfully issued. But, under our statute, such a grant is an assurance of title purporting to convey an estate in fee which will ripen into an estate in fee by an open, notorious and continuous adverse possession of the land described therein, for the length of time prescribed by the statute, to the extent of the interlap with an older grant. It

is the adverse possession whi:h controls the rights of the parties, the assurance of title determining the boundaries of the possession: *Hunter* v. *O'Neal*, 4 Baxt., 494.

The judgment below must be reversed, and judgment rendered here in favor of the defendant, in accordance with the agreement of the parties, with costs.