# STEARNS COAL & LUMBER CO. et al. v. KITCHEN LUMBER CO.—182 S. W. (2d) 4.

Eastern Section. March 14, 1944.

Petition for Certiorari denied by Supreme Court, June 10, 1944.

Templeton & Templeton, of Jellico, and James A. Monroe, of Chattanooga, for appellant Kitchen Lumber Co.

Ward R. Case, of Jamestown, for appellee Stearns Coal & Lumber Co.

BURNETT, J. The original bill in this cause was filed January 2, 1941, by the Stearns Coal & Lumber Company, a corporation, and others, against the Kitchen Lumber Company, a corporation, for the purpose of recovering the value of certain trees allegedly belonging to the complainants and unlawfully cut on their land and appropriated by the defendant. The phraseology of the bill anticipated a boundary line dispute and settlement of

that question was invited under Code, sections 10368 and 10369.

Twenty days after this bill was filed the defendant filed a general denial.

After the complainant had proven its case on the issues as thus made up, the defendant on December 29, 1941, filed an amended answer and cross-bill in which it asserted title to the land itself. On this date the complainants filed an amended and supplemental bill in which they specifically allege that the original bill was filed within the purview of the Code sections heretofore set forth and that they claim title under and through a grant by the State of Tennessee to one James Sharp dated March 22, 1873. They also allege that the defendant, Kitchen Lumber Company, and its predecessors in title are estopped to claim title to the land in question by reason of certain litigation hereinafter to be set forth.

The case is thus ejectment by both sides plus the action for timber cut as set forth in the bill as originally filed.

The Chancellor dismissed the cross-bill of Kitchen, rendered judgment against Kitchen for $508, applying the mild rule, and decided the boundary line dispute in favor of Stearns as claimed by them. He also decided that Stearns was the owner in fee and entitled to the possession of the land sued for. Both parties have appealed and assigned error.

About 3000 acres of land is involved in the controversy. It is the same land that was involved in the old case of Sharp v. VanWinkle, 80 Tenn. 15. It was held in Sharp v. VanWinkle. supra, that even though Sharp claimed under a junior grant he had acquired title by adverse possession. Stearns deraigned title back to Sharp and the grant of the State of Tennessee to him. Kitchen de-

raigned title back to VanWinkle and his predecessors in title including the Patent from the State of Kentucky.

If we correctly understand the following paragraph from Kitchen's brief they concede the corrections of the decision in Sharp v. VanWinkle, supra, and only claim by adverse possessions under the color of title thereafter acquired:

"And defendant and cross-complainant makes no contention here adverse to the holding of the Chancellor in so far as the same relates alone and is confined to the one particular title which originated under the paramount title based under said Patent No. 2971—foregoing any contention as to that particular title upon this appeal—but said defendant and cross-complainant relies upon the title which was thereafter acquired by adverse possession under color of title which became vested in cross-complainant."

The decision in Sharp v. VanWinkle, supra, was handed down in 1883 and has been cited and relied on many, many times since. To all intents and purposes it has now become a "rule of property."

It is the position of Kitchen that one Cal Chitwood held possession of portions of the property in controversy for their predecessors in title from about 1893 until 1908. The Kitchen predecessors in title did have a deed purporting to convey the fee in this entire property to them. These various deeds are cover all deeds. They purport to convey "all the interests," etc., owned by the grantor. Generally they describe the boundary as was set forth in the Patent from the State of Kentucky. Some mention certain exclusions. If their contention is sustained, by the facts in this large record, certain links in the chain of title of Stearns are champertous and void.

We have enjoyed making a rather careful study of this entire record. It discloses the following state of facts.

John S. VanWinkle acquired title to a large boundary of land lying in the counties of Scott and Campbell, north of latitude 36° 30″. The grant, or patent as it is called in Kentucky, was issued by the State of Kentucky on April 7, 1851. James Sharp made an entry on some of this land and was granted 5000 acres by the State of Tennessee in 1873. Sharp established possessions on about 100 acres of this land and by reason of this possession his title was held superior to that of VanWinkle in Sharp v. VanWinkle, supra. This suit was determined on November 9, 1883.

One Cal Chitwood established a possession on this Sharp interlap about 1868. He built a house and cleared up a small boundary. On August 14, 1880, Cal Chitwood signed a document wherein he recited that he was holding his possession for VanWinkle and had been so holding for twelve years. This document is filed in the instant suit and is very strongly relied on by Kitchen—especially the words written on the back of the document, "Calvin Chitwood Holds Possession." According to the date of the document (we think the document should be denominated an estoppel agreement and not a lease) it was entered into before the institution of the suit, Sharp v. VanWinkle, supra. Apparently it was not thought of or referred to in that case because the Supreme Court in its opinion in 80 Tenn. at pages 17 and 18 says:

"It was also agreed that the legal title to the land thus granted had been vested by mesne conveyances for a valuable consideration in the plaintiff, VanWinkle, but that no actual possession of the land had ever been taken under the grant." And

"The defendant, Sharp, through his tenants, had entered upon the land in the interlap not covered by older claims than those of either of the parties, and enclosed three different parcels, amounting in all to 100 acres, claiming under his grant, and has held the same for more than seven years last past, and still so holds them."

If the facts as set forth in this document were true, why did VanWinkle agree as above set forth. He was a lawyer and appeared as counsel along with other eminent counsel of the time as is shown by the reported opinion.

A few years after the opinion in Sharp v. VanWinkle, supra, Sharp instituted suit against this same Calvin Chitwood and others to eject them from the land they were holding within this interlap. This suit ended in a compromise decree in which Calvin Chitwood was deeded 50 acres which he held. In 1906 Calvin Chitwood deeded this same 50 acres to the predecessors in title of Stearns.

In addition to this 50-acre tract Calvin Chitwood had cleared and fenced a twelve acre apple orchard some distance from this 50-acre tract. He also cleared and used other small parcels of ground near the 50-acre tract. It is not shown when these outside boundaries were taken possession of by him. We think though that a proper deduction from the evidence is that they were cleared and taken possession of long before any supposed arrangements were made with him by Kitchen's predecessors in title. We think too that he took possession of them as "his'n," to use an expression of some of the witnesses. When Calvin Chitwood sold this 50-acre tract in 1906 he agreed to give possession by January 1, 1908. He did not claim then to be holding any of this land or his possessions for others.

John S. VanWinkle died in 1888 and by his will be left his property to his widow. As such devisee she acquired all outstanding interests in this large boundary of land. She had her son, John S. VanWinkle, to look after this land for her. This young man was about 18 years old at his father's death. VanWinkle, Jr., appointed one Granville Chitwood, who lived near the property, to act as his agent on the property. Granville Chitwood, or Scally Gran Chitwood as he was called, had a son, William Chitwood, who was almost two years older than Van Winkle, Jr. These two young men (they were 70 and 72 years old respectively when they testified herein) are the "principallest" (a very descriptive term used by one of the witnesses herein) witnesses on behalf of Kitchen as to the adverse possessions claimed.

Granville Chitwood had been a land agent for Van Winkle, Sr. He was employed for like work by Van Winkle, Jr., i. e. to keep squatters off the land, to stop theft and destruction of the timber and to make leases or estoppel agreements with those on the land. William Chitwood says that his father made a lease with Calvin Chitwood to look after this land and hold possession for VanWinkle. His information about this matter is gained from conversations he heard between his father and VanWinkle, Jr. He says he heard them read the lease, etc. William Chitwood also tells about the orchard and attempts to fix its age as beginning in the period when VanWinkle, Jr., looked after the land.

VanWinkle, Jr., does not attempt to say nor does he intimate he made a lease with Calvin Chitwood. Likewise he does not say he authorized Granville Chitwood to make any such lease. He identifies the document we have herein referred to as an estoppel agreement as being in the handwriting of his father. He also says the words

on the back thereof, ''Holds Possession'' are in his handwriting. He says in reference to the circumstances to this endorsement by him:

''I cannot, with any exactness, refer to the time or date. My statement must be confined to this, that it was then based upon whatever information had come to me during the years in which I represented my mother.''

''Q. Did you know Calvin Chitwood, this lessee in this lease, Mr. VanWinkle? A. I have no definite memory of knowing him. I was in that country, of course, but after the space of years I do not recall more than that.''

Mr. VanWinkle is apparently a very intelligent and high type witness. He is two years younger than Will Chitwood, who apparently hasn't much education. We are asked here to give greater weight and credence to the testimony of a witness who is attempting to detail what another witness will not and does not so testify. The testimony of William Chitwood certainly stands no higher than that of John S. VanWinkle. VanWinkle's writing the words ''Holds Possession'' was purely based on hearsay or rumor and there is no showing herein of any basic fact upon which to verify the same.

During the time VanWinkle, Jr., was looking after his mother's property, while Calvin Chitwood lived on the property acquired by Stearns, the predecessors in title to Stearns were cutting timber and logging it all around the Calvin Chitwood house without protest from him or anyone else. During that same period VanWinkle had sold timber off the adjoining tract which he controlled. VanWinkle knew of the cutting of timber on the land and they raised no protest.

On December 28, 1900, Mrs. VanWinkle sold her holdings to John LeMoyne. Within a few years thereafter the LeMoynes had their property surveyed and the line

between the predecessors in title of the parties herein run and marked. This line as then run is substantially the boundary line accepted by the Chancellor herein. This line was recognized by the LeMoynes for about 30 years. The line was marked on trees, etc., by cut marks and red paint. When LeMoyne sold to Kitchen in 1934 they retained a lien for the unpaid purchase price with an agreement that Kitchen might cut the timber and pay so much per thousand on the unpaid purchase price for the timber as cut. One Chambers represented LeMoyne in this. He did not estimate or credit LeMoyne with timber that was cut across this line.

The testimony of one P. M. Wright, 88 years old, is very strongly relied on by Kitchen to establish the adverse possession of Calvin Chitwood. This witness had been familiar with this property and the possessions since 1870. He says he purchased timber from James Sharp in 1894 around the Cal Chitwood possessions. There was no claim then that Cal Chitwood held possession for Kitchen's predecessors in title—Chitwood claimed his possessions for himself. He thinks that about 1907 Cal Chitwood ''said that he had a lease for some land from VanWinkle.'' Chitwood sold out to Stearns' predecessors in 1906. He made no claim then that he was holding his possessions for the VanWinkles or their successors in title, the LeMoynes. LeMoyne had had the boundary line run then. In 1907 Cal Chitwood had lived there and his possessions had been known by Wright since 1870. Wright testifies in 1941 about these things. It is more than likely that his recollection is rather blunted after this long period of time. There is no showing where or when this adverse holding occurred. We think the acts of the parties at the time of much stronger

efficacy than the statements based on hearsay when testified to nearly forty years later.

 Kitchen must establish an actual, open, notorious, exclusive and hostile possession for the full statutory period by clear and positive proof before they can maintain their position. These "elements cannot be made out by inference." I Am. Jur., p. 928, citing cases from many jurisdictions, including this State. We do not think Kitchen has made out such a case as is required to establish title by adverse possession.

A letter written by Chambers in 1925 to the present counsel for Kitchen is relied on. At the time this letter was written Chambers was evidently anticipating employment by one of Kitchen's present counsel. Any statements he made in that letter certainly cannot be considered as substantive evidence herein.

This record is pregnant with facts which to our mind conclusively negative an adverse holding of this property in favor of Kitchen. There is entirely too much to review in this opinion. We have tried to base our discussion of the evidence herein on that as principally supporting in any way the basis of such a claim.

 It is contended by Stearns that the Chancellor should have applied the "harsh" rule in assessing damage for this trespass.

It has been held that rules applicable in mining trespass cases are likewise applicable in a suit for wrongfully cutting timber. Holt & Johnson v. Hayes, 110 Tenn. 42, 73 S. W. 111. These rules are laid down in Dougherty v. Chestnutt, 86 Tenn. 1, 5 S. W. 444, 446, in the following language:

"The mild rule is applied where the wrong was innocently done, by mistake or inadvertence; the harsh, where the facts show the trespass to have been malicious,

or with full knowledge of the title of the injured party, and in willful disregard of his rights. The former rule charges the defendant with the value of the coal, ore, or rock mined, in situ,—usually measured by the royalty charged in the particular locality. The latter charges him with the value of the same after severance, without compensation for mining and preparing for market.''

There was a real question here in the mind of counsel for Kitchen when they purchased this land. Apparently they were so advised. The boundary line near which this timber was cut is by no means certain and definite. As is heretofore pointed out this developed into a real ejectment suit. There is no showing that they willfully cut this timber. We are of the opinion that the proper rule was adopted.

The result is that all assignments must be overruled and the finding of facts and conclusions of law of the Chancellor are concurred in by us. The appellant Kitchen Lumber Company and its sureties are taxed with all costs.

McAmis and Hale, JJ., concur.